UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MOHAMMAD KARAMOUZ,

                Plaintiff,

     -against-

NEW YORK UNIVERSITY POLYTECHNIC
SCHOOL OF ENGINEERING,

                Defendant,
------------------------------------------------------------------X

COMPLAINT

Docket No.: 15-CV-3853

Jury Trial Demanded

    Plaintiff, MOHAMMAD KARAMOUZ, by and through his attorneys, WHITE, RICOTTA & MARKS, P.C., allege upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

### JURISDICTION AND VENUE

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*, and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and aforementioned statutory provisions.

3. Venue is proper pursuant to 28 U.S.C. § 1391.

4. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"). A notice of a right to sue letter was issued on April 2, 2015. This action was properly commenced

1

within ninety (90) days of Plaintiff's receipt of said notice.

## PARTIES

5. Plaintiff, Mohammad Karamouz ("Mohammad"), was and still is a resident of Nassau County, State of New York.

6. Defendant, New York University Polytechnic School of Engineering ("NYU" or "Defendant") was and still is a school located at 6 MetroTech Roadway, Brooklyn, New York 11201.

## FACTS

7. Mohammad Karamouz ("Mohammad") is a sixty-one (61) year old American Citizen of Iranian descent born on July 16, 1954 in Kerman, Iran. He moved to the United States when he was twenty-three (23) years of age and became a citizen in 2001.

8. Mohammad is a recognized expert in the fields of water resources, environmental engineering, fluid mechanics and hydraulics. He has taught at the undergraduate and graduate levels in his field for approximately thirty years and has published extensively on these topics including six textbooks and over 300 technical and scientific papers. At Pratt Institute he worked as a tenured professor in the school of engineering and architecture, and was the interim Dean of the School of Engineering and the head of the Department of Civil Engineering over the course of fourteen years.

9. In 2009, NYU succeeded in luring Mohammad. In doing so, the Provost of NYU at the time, Dianne Rekow, promised Mohammad tenure. This is a common practice in academia, in which a tenured professor is promised tenure as part of his or her package in order to induce them to move to a new university. Without such a practice it would, understandably,

be very difficult to induce tenured professors to leave their institute for employment elsewhere because they would be exposed to the undue risk of a new tenure process. Such a promise does not absolve the professor in question of a need to go through the formalized steps of tenure, it simply guarantees the result of the process at completion. At least four other current tenured professors at NYU have attained their tenure in this manner.

10. On February 16th, 2011, the NYU faculty of the Department of Civil Engineering voted 13 to 1 to grant Mohammad tenure in their department.

11. Following that vote, Dianne Rekow declared that she wanted to have a permanent chair in Civil Engineering before granting Mohammad tenure. As a way of showing her full support for Mohammad, she offered Mohammad a 20% salary increase, quite unusual in NYU salary increase practices.

12. During his time working at NYU, Mohammad repeatedly witnessed mistreatment of Muslims including how Yaser Alttayar, a Saudi national that was Mohammad's PhD student, was treated in his qualification exam by Larry Chiarelli. Chiarelli was not part of Yaser's examination committee but participated in baselessly accusing Yaser of cheating. That charge was proven to be false and Yaser passed the qualification exam. Yaser was then forced not to continue with Mohammad as his advisor. He was told he would be dismissed from continuing his degree if he did not change advisors.

13. On or about October 2011, Dr. Fletcher Griffis ("Griffis"), the head of the tenure committee, made an anti-Iranian comment, stating "An Iranian cannot be trusted."

14. Griffis has made other anti-Iranian comments, such as, "You guys [Iranians] are too sentimental."

15. Griffis, consistently refused to use Mohammad's name, choosing repeatedly to refer to Mohammad only as "faculty member" despite their extended period of time working together. Similarly situated non-Iranian, non-Islamic professors were not referred to in such a fashion. This went on for so long that Mohammad actually spoke up during a faculty meeting once, stating, "You can call me Mohammad instead of faculty member."

16. Larry Chiarelli ("Chiarelli"), an interim department head of Mohammad's department, treated all three Iranian professors under his supervision worse than he treated the rest of his faculty members. Specifically, Chiarelli treated Ann Ronan favorably in giving her a high starting salary, visiting her office frequently, and consulting with her on all issues relating to environmental engineering while not similarly communicating with Mohammad, despite the fact that he was the Director. In comparing Chiarelli's treatment of Ronan with his treatment of Mohsen Hussein, another faculty member of Iranian descent, a pattern of discrimination emerges. Hussein had better qualifications, but his salary was lower as was his rank.

17. Chiarelli was also insulting toward Masoud Ghandahari, another faculty member of Iranian descent. His racist behavior reached such a frustrating level that Masoud once actually left a faculty meeting to protest Chiarelli's behavior.

18. On or about March 2013, Dr. Ilan Juran ("Juran"), a member of the tenure committee of Israeli national origin said that Iranians display weakness in tolerating their government. Juran also spoke of his role in denying Palestinian water rights and expressed that he was actively involved in that process and that he was proud to have been involved. These comments caused Mohammad to believe that Juran had an anti-Islamic and/or anti-Iranian animus. Juran had direct involvement in blocking Mohammad's tenure.

4

19. After Hurricane Sandy, Mohammad organized a think tank called the New York State Resiliency Institute for Storms and Emergencies (NYS-RISE) and was, in turn, selected as the Principal Investigator and Director for the group. Through his involvement, NYU was selected as the principal university behind the think tank, securing $3.2 million dollars for the University. This prestigious and extremely profitable news for NYU was announced on March 22, 3013.

20. In or around September 2011, the Provost of NYU-Poly was replaced by Dr. Katepalli R. Sreenivasan ("Sreenivasan."). Sreenivasan also promised Mohammad tenure repeatedly, including as late as July 2013.

21. Mohammad was sixty years of age in a department with five faculty members significantly older than himself.

22. On or about July 2013, Professor Iskender ("Iskender") took over as the Head of Mohammad's department. Iskender initially attempted to assist Mohammad with receiving tenure, but was unable to arrange it. Frustrated, Iskender confided to Mohammad, "Apparently they have some difficulties with your age."

23. Shocked, Mohammad responded, "But I have so much energy! My father is 100! I publish a paper every twenty days, I worked sixteen hours per day for six months after Sandy! How can you say this about my age?" Iskender indicated that the decision was out of his hands.

24. Iskender elaborated further, stating, "Since we have too many older professors, they are not going to give you tenure."

25. On or about August 2013, Sreenivasan specifically said to Mohammad that he viewed Mohammad to be close to retirement age. Sreenivasan further stated that the older tenured professors in Mohammad's department had very limited academic production and stressed

that he needed to avoid this happening again, putting this rationale forth as a reason for not granting Mohammad tenure due to his age, in spite of his outstanding performance.

26. In his time at NYU, from 2009 to 2014, Mohammad published three times the number of publications published by the rest of his department combined, possibly more than any other faculty member at NYU. He also directed the environmental engineering and environmental science programs.

27. In 2013, Mohammad received a prestigious award for achievement in his field from the American Society of Civil Engineers.

28. In or around 2013, Sreenivasan came to Mohammad and said, "Mohammad, you don't have much time left. Make sure you arrange another appointment somewhere else."

29. On or about August 25, 2013, Mohammad was suddenly removed from the campus by security guards. At no point was Mohammad warned that such action would be taken or told not to come to work. He was advised that NYU personnel wanted to terminate him. Within a few days, Mohammad was permitted to return to campus and resume his job duties. Mohammad received a pay check and continued to receive benefits.

30. In or around August 2014, Mohammad was formally notified in writing that NYU would not be renewing his contract.

31. At about the same time, two professors in their forties, nearly fifteen years younger than Mohammad, received renewed contracts. Both professors were substantially less experienced and less accomplished than Mohammad.

32. Moreover, Mohammad was terminated despite the fact that he had been promised, and should have received tenure, thereby preventing such action from being taken by NYU.

33. Mohammad was replaced by a Caucasian male (Griffis) in the NYS-RISE who was far less qualified than Mohammad.

34. Based on the foregoing, Mohammad alleges that Defendant discriminated against him based on his sex and age in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and has suffered emotional, physical, and financial damages.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

35. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint. Title VII of the Civil Rights Act of 1964 provides that

    a. It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

36. As described above, NYU has subjected Plaintiff to discrimination based on his national origin and religion by failing to renew his contract, subjecting him to an atmosphere of adverse actions, and maintained a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

37. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint. The Age Discrimination in Employment Act of 1967 provides that

a. It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or (3) to reduce the wage rate of any employee in order to comply with this chapter.

38. As described above, NYU has taken adverse employment actions against Plaintiff, including maintaining an atmosphere of adverse actions and failing to renew his contract or grant him tenure, which were motivated, in part, upon Plaintiff's age, in violation of the Age Discrimination in Employment Act of 1967.

WHEREFORE, Plaintiff demands judgment against Defendant, where applicable, for all compensatory, emotional, and physical damages, punitive damages, lost pay, front pay, reinstatement, injunctive relief, and any other damages permitted by law. Plaintiff demands a trial by jury.

Dated: Long Island City, New York
July 1, 2015

Respectfully submitted,

WHITE, RICOTTA & MARKS, P.C.
Attorneys for Plaintiff
3110 37th Avenue, Suite 401
Long Island City, New York 11101
(347)464-8694

_____
Thomas Ricotta